**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **JOHNNY L. McGOWAN, JR., #220161,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 3:14-cv-00578** |
| **v.** | ) | **Judge Trauger / Knowles** |
| | ) | |
| **CORIZON MEDICAL, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## REPORT AND RECOMMENDATION

This matter is before the Court upon two Motions for Summary Judgment: the first, filed by Defendants Kevin Gunn and Darrell Thomas (hereinafter "Transportation Defendants") (Docket No. 167); and the second, filed by Defendants Corizon, Inc., and Clement Bernard (hereinafter "Corizon Defendants") (Docket No. 173). In support of their Motion, the Transportation Defendants have contemporaneously filed a Memorandum of Law (Docket No. 168), a Statement of Undisputed Material Facts (Docket No. 169), the Affidavit of Kevin Gunn ("Gunn Aff.") (Docket No. 167-1), the Affidavit of Darrell Thomas ("Thomas Aff.") (Docket No. 167-2), the Affidavit of Diane Henson ("Henson Aff.") (Docket No. 167-3), Excerpts from Plaintiff's Deposition ("Plaintiff's Dep.") (Docket No. 167-4), the unsigned Affidavit of Clement Bernard (Docket No. 167-5), and Plaintiff's medical records (Docket No. 167-6). Supporting their Motion, the Corizon Defendants have contemporaneously filed a Memorandum of Law (Docket No. 176), a Statement of Undisputed Material Facts (Docket No. 174), the Affidavit of

Clement Bernard[1] ("Bernard Aff.") (Docket No. 175), and Plaintiff's medical records (Docket No. 175-1).

Plaintiff has filed a Response to the Corizon Defendants' Motion for Summary Judgment and has attached his Affidavit thereto. Both docketed as Docket No. 196. Plaintiff also contemporaneously filed a Memorandum of Law in support of that Response (Docket No. 196-1), and a Response to Corizon Defendants' Statement of Undisputed Material Facts (Docket No. 196-2). Plaintiff's Response to Corizon Defendants' Statement of Undisputed Material Facts does not, however, contain the requisite citations to the record.

Plaintiff has not responded to the Transportation Defendants' Motion or Statement of Undisputed Facts.

Plaintiff, a TDOC inmate, originally filed this pro se § 1983 action against numerous defendants on July 3, 2013, in the Western District of Tennessee. Docket No. 1. On February 26, 2014, Plaintiff's claims against the Corizon and Transportation Defendants were severed and transferred to this Court. Docket Nos. 34, 35. Plaintiffs claims against the instant Defendants arose after he was injured in an altercation with other inmates in the West Tennessee State Penitentiary ("WTSP"). Docket No. 1. As pertains to the Transportation Defendants, Plaintiff contends that Defendant Gunn was the WTSP transportation supervisor who made him ride on a

---

[1] Dr. Bernard signed this Affidavit. Docket No. 175. All citations to "Bernard Aff." will reference Docket No. 175, the signed Affidavit.

Dr. Bernard's Affidavit provides in relevant part, "The matters stated herein are made on my personal knowledge and upon my review of the prison medical records maintained for Plaintiff." Docket No. 175, p. 2. Dr. Bernard's Affidavit further establishes that the medical records were made at or near the time reflected in the records, that they were made by persons with knowledge of the matters recorded, that they are kept in the regular course of the regular conducted activities in the handling of medical matters related to inmates incarcerated by TDOC, and that it is the regular practice of the staff to make these records. *Id.*

chain bus without padded seats between WTSP and the Lois DeBerry Special Needs Facility

("DSNF"), where he was having his altercation injuries treated from March to May 2013

(Plaintiff's Dep., p. 6:24-45, 7:1-7), and that Defendant Thomas was the DSNF transportation

supervisor who once refused to allow him to bring a blanket on the bus (*Id.* at 12:19-25).

Regarding the Corizon Defendants, Plaintiff contends that he was taking Tylenol #3 at the

time he arrived at DSNF on March 7, 2013, but that, without examining him, Defendant Bernard

refused to renew his prescription, and did not write Plaintiff another prescription for it or any

replacement pain medication until after Plaintiff filed a grievance (at which time Defendant

Bernard prescribed Ibuprofen, which did not help). Docket No. 1, ¶¶ 20, 22. Plaintiff avers that

Defendant Bernard did so pursuant to Corizon's policy, practice, or custom. *Id.* Plaintiff also

contends that, pursuant to Corizon policy, Defendant Bernard overruled Dr. Robert Baker's

recommendations for Plaintiff, one of which was to hold Plaintiff at DSNF. *Id.*, ¶¶ 21, 25.

Plaintiff contends that, despite his "back fracture with spinal damage," Defendant Bernard

overruled the recommendation to hold Plaintiff at DSNF and cleared Plaintiff to be transported

back to WTSP. *Id.* Plaintiff further contends that, as a result of Defendant Bernard's overruling

Dr. Baker's recommendations, he did not receive an MRI until almost one year after the

altercation. Docket No. 69, Amended Complaint, ¶ 25. Ultimately, Plaintiff contends that, as a

result of Defendant Bernard's actions, he "has been and continues to be delayed in receiving the

proper and necessary medical treatment (possible back surgeries) and has been repeatedly taken

off the pain medication Lortab 5's and 10's and the muscle relaxer, which he had been taking for

more than (1) one year, although the Plaintiff continues to suffer from severe back pain." *Id.*

Plaintiff argues that Defendant Bernard acted pursuant to a custom, policy, or procedure

established by Defendant Corizon, Inc., to deny surgery and other treatments. *Id.*

As grounds for their Motion for Summary Judgment, the Transportation Defendants argue that: (1) as TDOC employees, they have Eleventh Amendment Immunity and are not "persons" subject to suit under § 1983 in their official capacities; (2) *respondeat superior* is not a basis for the imposition of liability under § 1983, and Plaintiff has not averred sufficient personal involvement of Defendant Gunn; (3) Plaintiff's transportation claims fail to state an Eighth Amendment conditions of confinement claim; (4) Plaintiff's transportation claims fail to state an Eighth Amendment deliberate indifference to medical needs claim; (5) because he suffered no physical injury as a result of his transportation, Plaintiff's claim is barred by the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(e); (6) as government officials acting in good faith in their official capacities, they are qualifiedly immune from suit; and (7) pursuant to Tenn. Code Ann. § 9-8-307(h), which provides that state employees have absolute immunity for acts or omissions within the scope of their employment, they have absolute immunity from Plaintiff's negligence claims, and the Court should decline to exercise supplemental jurisdiction over those claims. Docket No. 168.

As noted, Plaintiff has not responded to the Transportation Defendants' Motion for Summary Judgment or Statement of Undisputed Material Facts.

In their Motion, the Corizon Defendants argue that they are entitled to summary judgment because Plaintiff cannot sustain his Eighth Amendment deliberate indifference to a serious medical need claim against them. Docket No. 176. Specifically, the Corizon Defendants contend that "there is a complete absence of evidence supporting any claim that Plaintiff suffered damage or injury as a result of the conduct of the Corizon Defendants." *Id.* They also argue that

4

Defendant Bernard's "conduct was medically appropriate, met the applicable standard of care, and does not satisfy the requirements for a claim of deliberate indifference." *Id.* Defendant Corizon further argues:

> Since Dr. Bernard's conduct supports no claim for a constitutional violation, there is no basis for the imposition of corporate liability upon Corizon. Moreover, the record shows Dr. Bernard's conduct was made in the exercise of his independent medical judgment and there is no evidence to support a claim that any custom, policy or procedure caused any constitutional harm to Plaintiff.

*Id.*

Plaintiff has responded to the Corizon Defendants' Motion for Summary Judgment. Docket No. 196. Plaintiff argues, *inter alia*, that Defendant Bernard "ignored the recommendations of a top orthopedic specialist" and cleared Plaintiff for transport back to WTSP, and that in so doing, he "violated TDOC Policy and Procedures . . . thereby being deliberately indifferent to the Plaintiff's medical needs and subjecting the Plaintiff to the unnecessary and wanton infliction of pain. . ." *Id.* Plaintiff also argues that, "pursuant to the Independent Contractor Physician Agreement between Corizon, Inc. and Dr. Clement Bernard . . . . Dr. Clement Bernard was acting at all times relative on behalf of Corizon, Inc., who insured or had Dr. Bernard insured for liability coverage." *Id.* Plaintiff additionally contends that, as an employee contracting with Corizon, Inc. as a physician to provide medical services at DSNF, Defendant Bernard was in a policymaking role. *Id.* Plaintiff adds, "The policymaking role of Dr. Bernard might support an award of damages against Corizon, Inc." *Id.* With regard to Defendant Corizon's policies, Plaintiff contends:

> Corizon's widespread custom, policy, and practice to save money .
> . . by discouraging its staff from refferring [*sic*] inmates with

5

> complaints of serious medical conditions to its contracting
> specialist and outside medical practitioners or facilities for
> examination and/or treatment. This policy, custom, and practice
> included deffering [*sic*] inmates to later dates, sometimes weeks
> and months before the inmates receive proper medical treatment. . .
> . Moreover its independent contracting physicians are ignoring the
> hired specialist recommendations for the purpose of delaying
> treatments and saving money. . . .

*Id.* (internal citations omitted).

Plaintiff further asserts that Defendant Corizon failed to properly train its contracting

physicians on "following TDOC policy and procedures relative to interacting with the

recommendations of specialist[s] in various medical fields . . ." *Id.* Plaintiff asserts that he

continues to suffer pain, and "has many health restrictions that could possibly be avoided had Dr.

Bernard complied with the recommendations of orthopedic specialist[] Dr. Baker." *Id.*

For the reasons set forth below, the undersigned recommends that both of the instant

Motions for Summary Judgment (Docket Nos. 167 and 173) be GRANTED, and that this action

be DISMISSED.

## II. Undisputed Facts[2]

## A. Plaintiff's TDOC Medical Records ("TDOC Med. Rec.")

Plaintiff was injured in an altercation with other inmates on February 12, 2013 and

sustained L-3 and L-4 non-displaced fractures in the lower back with no neurological deficits.

Docket No. 167-6. X-rays taken on March 1 and March 7, 2013 revealed no traumatic injury to

Plaintiff's neck. *Id.*

Plaintiff's TDOC medical records contain no medical orders (AVO's) prohibiting travel

---

[2] Unless otherwise noted, the following facts are in a form required by Fed. R. Civ. P. 56
and are undisputed.

by chain bus.  *Id.*

**B.  Affidavit of Clement Bernard ("Bernard Aff.")**

Defendant Bernard is a medical doctor licensed to practice in the State of Tennessee who was employed by Corizon, Inc. to provide medical services to TDOC inmates.  Docket No. 175, ¶ 1.

Plaintiff suffered numerous injuries on February 12, 2013.  *Id.*, ¶ 2.  Plaintiff underwent diagnostic studies performed at Lauderdale Community Hospital, which noted the following abnormal acute findings: diffuse soft tissue swelling of the scalp; small blowout fracture of the medial orbital wall; and fracture of the left L-3 transverse process.  *Id.*  CT scans of Plaintiff's head showed no intracranial abnormalities.  *Id.*  CT scans of Plaintiff's neck also showed no abnormalities.  *Id.*  On or about the following day, Plaintiff was returned to WTSP and was admitted to the infirmary.  *Id.*, ¶ 3.

On February 18, 2013, Dr. David Moore, Plaintiff's principal treating physician, noted that Plaintiff had sustained a right tympanic membrane rupture, in addition to the injuries reported on the hospital diagnostic testing.  *Id.* Dr. Moore's plan was for Plaintiff to be seen by orthopedic, ENT, and ophthalmic specialists.  *Id.*  Dr. Moore also noted that Plaintiff should progressively ambulate after his neck was cleared.  *Id.*  On February 19, 2013, Dr. Moore requested that Plaintiff be seen for orthopedic and ENT consultations.  *Id.*  On February 21, 2013, Dr. Moore ordered that Plaintiff could begin to walk without assistance utilizing canes.  *Id.*

On March 1, 2013, x-rays were taken of Plaintiff's neck to clear him from having to continue to wear a cervical collar.  *Id.*, ¶ 4.  The x-ray report noted no acute fracture or subluxation.  *Id.*  It noted mild spondylosis at the C5-C6 level.  *Id.*  This indicates a degenerative

process and is not associated with trauma. *Id.*

Plaintiff's medical records reflect that, on March 6, 2013, Plaintiff was transferred to the transit unit at DSNF ("Transit Unit"). *Id.*, ¶ 5.

On March 7, 2013, x-rays were performed on Plaintiff s neck and lower back. *Id.*, ¶ 6. The lumbar x-ray report noted non-displaced fractures of the left L-3 and L-4 transverse processes and a minor leftward curvature, which may have been in part caused by Plaintiff s positioning. *Id.* The cervical x-ray report showed no fractures, loss of disc height, or misalignment. *Id.* The only positive finding was mild straightening of the lordotic curve. *Id.* This is a non-specific finding that may be related to pain or muscle spasms or it may be congenital. *Id.* This x-ray was compared to the x-ray performed on March 1, 2013, and the radiologist noted that no significant interval changes were seen in the minor degenerative changes that had been noted in the mid-cervical spine on the previous x-rays. *Id.* Defendant Bernard reviewed the March 7, 2013 x-ray reports on March 8, 2013. *Id.*

Also on March 7, 2013, Plaintiff was seen by Dr. Ronald Baker, an orthopedic specialist. *Id.* Dr. Baker provided a handwritten note, which reflects that Plaintiff reported being assaulted three weeks earlier and complained of neck and low back pain. *Id.* Plaintiff reported taking Tylenol # 3, and reported no change in bowel or bladder habits and denied numbness or tingling in the upper extremities. *Id.* The report states, "x-ray ? spinous Process fx." *Id.* Dr. Baker's assessment was cervical sprain and lower back pain. *Id.* He noted that Plaintiff was "Not cleared," and recommended that Plaintiff begin physical therapy for his cervical spine and back and obtain a CT scan of his lower lumbar spine. *Id.*

On March 8, 2013, Defendant Bernard noted that he had reviewed Dr. Baker's note. *Id.*

As an outside specialist, Dr. Baker cannot issue orders; rather, it would be up to Plaintiff's prison doctors to decide whether Dr. Baker's recommendations would be adopted. *Id.*

On March 8, 2013, Defendant Bernard ordered that Plaintiff was medically cleared to be transferred back to WTSP, his "transferring facility." *Id.*, ¶ 8. Defendant Bernard noted that upon Plaintiff's return to WTSP, he should be seen at sick call for follow-up and for review of the orthopedic note. *Id.*

Dr. Baker dictated a note concerning his March 7, 2013 examination of Plaintiff. *Id.*, ¶ 9. The dictated note contains essentially the same information as his handwritten note but provides some additional findings and elaborates on his thought process. *Id.* Plaintiff complained of neck and lower back pain that was not relieved by Tylenol #3. *Id.* He denied numbness or tingling of the upper extremities or feet. *Id.* He reported back spasms, he expressed tenderness on palpation of the neck, and he had decreased range of motion of the neck. *Id.* Examination of his upper extremities revealed symmetrical grip strength and reflexes, and no muscle atrophy. *Id.* With respect to Plaintiff's lower extremities, Dr. Baker noted the spinal and transverse processes were tender to palpation at the L4-5 level. *Id.* The straight- leg raising test was positive for pain on the left at about 45 degrees. *Id.* Plaintiff's range of motion and reflexes were noted to be symmetrical and his motor strength was 4+/5, which is within normal limits. *Id.* Dr. Baker noted that the x-rays showed no obvious evidence of fracture or dislocation, but that he could not see the L4-5 area very well. *Id.* Dr. Baker noted that the cervical x-rays revealed no fracture or dislocation. *Id.* He noted they showed a loss of the normal lordotic curve. *Id.* Dr. Baker's impression was that Plaintiff had a cervical sprain and lower back contusion. *Id.* His recommendation was for Plaintiff not to be cleared to return to the transferring facility, but be

started on physical therapy for his neck and lower back. *Id.* Dr. Baker also recommended that Plaintiff have a CT scan of the lower back to rule out a possible fracture. *Id.* It unlikely that Defendant Bernard saw this note because it was not dictated and transcribed until March 9, 2013, which was after he had cleared Plaintiff for transfer back to WTSP. *Id.* If Defendant Bernard had seen this report, however, it would not have altered his decision to medically clear Plaintiff for transfer back to WTSP, as this report did not provide any medical findings or recommendations that were significantly different from those recorded in Dr. Baker's handwritten note. *Id.* In fact, this dictated note further confirmed the absence of any findings indicating Plaintiff had a condition that would make his medical clearance to travel contraindicated. *Id.*

Plaintiff was seen by Dr. Mark Williams for an ENT consultation on March 19, 2013. *Id.*, ¶ 10. Dr. Williams' assessment was that Plaintiff had tinnitus vertigo, a deviated septum, and hyposmia (reduced ability to smell). *Id.* He noted that the vertigo and tinnitus might be related to a cochlear concussion. *Id.* Dr. Williams' plan was to obtain a comprehensive audiogram to evaluate Plaintiff s hearing. *Id.* He noted that in the meantime, Plaintiff could be treated with meclizine for vertigo. *Id.* Dr. Williams also recommended that Plaintiff use a nasal spray to help with nasal obstruction and hyposmia. *Id.* Dr. Williams noted that if Plaintiff failed to improve, he might benefit from septoplasty and inferior turbinate reduction. *Id.* Dr. Williams noted that he would see Plaintiff for a follow-up visit after the audiogram was performed. *Id.*

On March 20, 2013, Defendant Bernard noted that he had reviewed the ENT note. *Id.*, ¶ 11. Defendant Bernard ordered that Plaintiff was cleared to return to his transferring facility. *Id.* He noted that upon Plaintiff's return to WTSP, he should be seen at sick call for follow-up and for review of the ENT note. *Id.*

On March 21, 2013, Defendant Bernard gave a voice order for Plaintiff to receive Motrin 600 mg. 3 times a day for 10 days. *Id.*, ¶ 12.

The medical records reflect that Plaintiff was transferred back to WTSP on or about March 27, 2013. *Id.*, ¶ 13. Defendant Bernard did not participate in Plaintiff's medical care after his transfer back to WTSP in March 2013. *Id.*

The records reflect that Plaintiff was transferred back to the Transit Unit on or about May 1, 2013. *Id.*, ¶ 14. He was seen by an ophthalmologist on May 2, 2013. *Id.* He was cleared for transfer back to WTSP on May 6, 2013, by another provider, and he was transferred back to WTSP on or about May 7, 2013. *Id.* Defendant Bernard was not involved with Plaintiff's care in any manner during this visit by Plaintiff to the Transit Unit. *Id.*

In March 2013, the Transit Unit was not a facility in which an inmate with Plaintiff's conditions would be housed on a permanent or long-term basis. *Id.*, ¶ 16. Inmates were transferred to the Transit Unit from their permanent places of incarceration for specialized services. *Id.* During the period of time relevant to Plaintiff's complaints, which included March 6, 2013 through March 27, 2013, Plaintiff was transferred to the Transit Unit to receive 2 separate consultations: one was for him to see an orthopedic specialist and the other was for him to see an ENT specialist. *Id.* These 2 consultations had been requested by Dr. Moore on February 19, 2013. *Id.* The medical records do not reflect that Dr. Moore had requested any other consultations at that time. *Id.* After Plaintiff was seen by the orthopedic and ENT specialists, it was appropriate for him to be transferred back to WTSP. *Id.* The Transit Unit receives patients from all of the prisons in the Tennessee prison system and it is critical to utilize its limited space efficiently. *Id.* It is not efficient to hold an inmate for procedures that have been recommended by an outside consultant but have not been requested by the principal treating physician, approved by utilization management, and scheduled. *Id.* While Dr. Baker

recommended that Plaintiff not be returned to WTSP but rather, be kept at the Transit Unit and provided physical therapy for his neck and low back and a CT scan of his lumbar spine, Dr. Baker did not have the authority to order these actions. *Id*. It would not have been appropriate for Defendant Bernard to act on Dr. Baker's recommendation; the appropriate procedure was for Plaintiff's principal treating physician, Dr. Moore, to make decisions regarding the need for, and timing of, any diagnostic testing, treatment, or consultations with specialists. *Id*. Once a treating physician requests such specialized services, the services are then subject to utilization management review before final approval and scheduling. *Id*. This is the procedure that was followed in Plaintiff's case. *Id*. Plaintiff had numerous conditions, not just orthopedic conditions, and Dr. Moore was coordinating and managing Plaintiff's care for all of these conditions. *Id*. As noted above, Dr. Moore began this process by requesting orthopedic and ENT consultations. *Id*. After these were completed, he requested other specialized services. *Id*. On March 28, 2013, after Plaintiff was returned to WTSP, Dr. Moore requested approval for Plaintiff to be seen by an ophthalmologist and to have an audiogram, and then to be seen again by the ENT specialist. *Id*. Dr. Moore also requested that Plaintiff receive physical therapy for his cervical spine and back. *Id*.

There is no evidence that by medically clearing Plaintiff to be transferred back to WTSP, Defendant Bernard caused Plaintiff any harm. *Id*., ¶ 17. The records reflect that on April 16, 2013, Plaintiff refused the audiogram and physical therapy that Dr. Moore had requested on March 28, 2013. *Id*. The record also reflects that Plaintiff refused transfer to be seen by the ENT specialist for an appointment scheduled for May 21, 2013. *Id*. The record further reflects that Plaintiff had an appointment scheduled with an orthopedic specialist in Memphis on May 7,

2013, which was rescheduled for May 30, 2013, because Plaintiff was at the Transit Unit to see the ophthalmologist during that time. *Id.* Plaintiff was seen by the orthopedic specialist on May 30, 2013, who requested that an MRI be performed on Plaintiff's cervical and lumbar spine. *Id.* Dr. Moore requested the MRI on June 5, 2013. *Id.* Initially, his request was denied because the utilization management reviewer was not provided sufficient clinical information to support the request. *Id.* It was noted that approval could not be based solely on the request of an outside orthopedic doctor. *Id.*

Dr. Moore re-submitted this request on June 17, 2013, at which time he provided supporting clinical information, and the request was approved. *Id.* The record reflects that Plaintiff was scheduled for an MRI on July 31, 2013. *Id.* The record does not reflect that Plaintiff actually received the MRI on this date, but the records do not clearly reflect why this did not take place. *Id.* The record does contain a refusal of services form dated July 29, 2013, but the form does not reflect the services Plaintiff was refusing at that time. *Id.*

The medical records reflect another request for the MRI was submitted on October 10, 2013, and an MRI was performed on February 14, 2014. *Id.* The report of this MRI shows no significant abnormalities. *Id.* No disc bulging, central spinal canal stenosis, or neuroforaminal narrowing was noted. *Id.* No acute fracture or subluxation was noted. *Id* The only abnormal finding was mild intervertebral disc desiccation, which the report specifically notes to be "compatible with early degenerative disc disease." *Id.* The finding of mild disc desiccation indicates a small loss of the fluid inside the disc, which is associated with the aging process. *Id.* It is not related to trauma and its presence placed Plaintiff at no risk of injury. *Id.* No treatment is medically

indicated for this finding. *Id.*

The handling of Plaintiff's specialized consultations was done within the standard of care and was wholly appropriate. *Id.*, ¶ 18. Dr. Moore chose specialized services compatible with Plaintiff's conditions and appropriate follow-up was provided. *Id.* The records reflect that only the June 5, 2013, request for an MRI was denied, but this decision was reversed after additional information was provided to the utilization management reviewer. *Id.* It is totally appropriate and within the standard of care for the utilization management reviewer to request clinical evidence supporting a procedure or testing before such specialized services is approved. *Id.* Moreover, any delay in receiving an MRI was of no consequence. *Id.* The MRI showed Plaintiff's condition to be completely benign. *Id.*

Corizon did not have any custom, policy, or practice to deny or delay medically indicated testing, consultations, or treatment. *Id.* While specialized services required review through the utilization management process, this is not unusual and is within the standard of care. *Id.* Plaintiff received extensive specialized services which Defendant Bernard's review of the medical records shows to have been handled in a manner that met or exceeded the standard of care. *Id.*

Defendant Bernard did not schedule transfers between the prisons and the Transit Unit. *Id.*, ¶ 19. Scheduling is handled by the prison security staff. *Id.* Defendant Bernard was not made aware of any condition of Plaintiff that required him to be transferred in any specialized manner. *Id.* Before clearing Plaintiff for transfer, Defendant Bernard reviewed the orthopedic and ENT notes and the cervical and lumbar x-ray reports dated March 7, 2013. *Id.* This

information did not provide any medical basis for transferring Plaintiff in a special manner. *Id.* When Plaintiff was transferred on March 27, 2013, it had been 6 weeks since the date of his initial injury (February 12, 2013). *Id.* His lumbar fracture should have been well on the way to healing at this time. *Id.* Dr. Baker's notes do not reflect that Plaintiff reported pain on palpation at the L-3 level, where x-rays show he had a fracture. *Id.* Moreover, the lumbar x-ray reports did not note any type of misalignment or other abnormality. *Id.* The x-ray reports indicated simple fractures in the lumbar spine. *Id.* No fractures or misalignment was found in the cervical spine on multiple studies performed at different intervals. *Id.* While the March 7, 2013, lumbar x-ray report notes lumbar fractures, it appears from Dr. Baker's notes that he could not visualize the fractures when he reviewed the x-rays and this is why he wanted a CT scan. *Id.* This does not indicate that Dr. Baker was concerned about an unidentified condition that may have put Plaintiff at risk for further injury; rather, it suggests that Dr. Baker simply desired more definitive studies. *Id.* If Dr. Baker was truly concerned about a danger to Plaintiff in transferring him, Defendant Bernard would have expected Dr. Baker to call him or have someone else call him with those concerns. *Id.* On previous occasions, Defendant Bernard has been contacted when specialists believed the process of transferring an inmate was medically contraindicated. *Id.* Dr. Baker's recommendation for Plaintiff to receive physical therapy for his lower back and neck strongly indicates that Dr. Baker did not believe Plaintiff was at risk for additional injury. *Id.* Physical therapy is not appropriate for a patient with a spinal condition that is unstable and may cause additional injuries, such as nerve damage. *Id.* Dr. Baker did not request that Plaintiff receive an MRI; nor did he record that Plaintiff reported

any tingling or numbness.  *Id.*  In fact, Dr. Baker's reports record no evidence that Plaintiff had any signs or symptoms indicating any neurological deficits.  *Id.*  A subsequently performed MRI confirmed that Plaintiff had no condition that could have caused any nerve injury.  *Id.*

Although Defendant Bernard does not remember the details of Plaintiff's stay at the Transit Unit in March 2013, he does not believe anyone asked him to approve Plaintiff to be transferred in any special manner.  *Id.*, ¶ 20.  If this had occurred, it would have been his normal practice to note this in the records.  *Id.*  If some other provider had ordered that Plaintiff be transferred in a specialized manner, it should have been reflected in the orders.  *Id.*  The medical records do not contain any such order.  *Id.*

The normal procedure for renewing pain medication is that a member of the nursing staff would notify Defendant Bernard if a patient's prescribed medication had expired.  *Id.*, ¶ 21. While Plaintiff claims that he filed a grievance regarding his not receiving his medication, Defendant Bernard was not informed of any such grievance and has not seen one.  *Id.*  The records reflect that Plaintiff's prescription for Tylenol #3 expired on March 11, 2013, and Defendant Bernard provided a voice order for Motrin on March 21, 2013.  *Id.*  The medication administration records, however, reflect that Plaintiff began receiving Motrin on March 19, 2013.  *Id.*  Defendant Bernard cannot explain this, but suspects that some other provider may have ordered Motrin before his order was entered in the medical records.  *Id.*  Defendant Bernard does not recall whether he was informed that Plaintiff had been receiving Tylenol #3, which contains a narcotic component.  *Id.*  The record reflects that Defendant Bernard was contacted by a nurse and that he ordered Motrin, and the prescription of Motrin would have

been his normal practice for a patient with Plaintiff's presentation. *Id.* Since patients typically are at the Transit Unit for only a short period of time, unless there is an acute need for a narcotic, it is not Defendant Bernard's normal practice to order a narcotic for pain associated with a chronic condition. *Id.* It was his opinion that Motrin was appropriate for Plaintiff's condition as it was described in the reports he read and the x-rays he reviewed. *Id.* While it may be appropriate in some cases to .provide narcotics on a long-term basis for a chronic condition, this is a decision that is best left to a primary care provider. *Id.* Defendant Bernard would have left the decision for the renewal of a narcotic to Dr. Moore, to whose care Plaintiff would soon be returning. *Id.*

Defendant Bernard did not need to personally examine Plaintiff to make a decision concerning his pain medication. *Id.* He relied on the records he had reviewed and very likely the report of the nurse who would have contacted him. *Id.* This is normal practice, which meets or exceeds the standard of care. *Id.* If Defendant Bernard had to personally examine a patient before he could make a decision regarding the prescription of medicine, it would needlessly delay the provision of treatment and would be inconsistent with the manner in which doctors practice medicine. *Id.*

Corizon did not have a custom, practice, or policy to allow medication prescriptions to expire without renewal or to deny the prescription of medically indicated medication. *Id.* The medical records show that Plaintiff was consistently prescribed medication different providers deemed to be medically indicated. *Id.* The decisions he made concerning Plaintiff's medication were based on his independent medical judgment and not on any specific direction

from Corizon. *Id.*

Defendant Bernard is familiar with the standard of care applicable to medical doctors practicing in the community or in a similar community at the time of the matters raised in Plaintiff's Complaint. *Id.*, ¶ 22. The care that was provided by Defendant Bernard and the other doctors met or exceeded the applicable standard of care. *Id.* At all times, Defendant Bernard acted in good faith and made the independent medical decisions he believed to be appropriate concerning Plaintiff. *Id.* At no time did he consciously ignore or refuse to address any serious need of which he was aware. *Id.*

## C. Excerpts from Plaintiff's Deposition ("Plaintiff's Dep.")

Plaintiff's movement between WTSP and DSNF is reflected on the Tomis Arrival/ Departure sheet. Docket No. 167-4, pp. 7:15-25 - 8:1; Exhibit 1. Plaintiff's first transport occurred on March 6, 2013 from WTSP to DSNF. *Id.*, pp. 8:24-25 - 9:1-4. Plaintiff's second transport occurred on March 26, 2013 from DSNF to WTSP. *Id.*, p. 11:18-22. The third transport occurred on May 1, 2013 from WTSP to DSNF. *Id.*, p. 13:11-13. The fourth transport occurred on May 7, 2013, from DSNF to WTSP. *Id.*, p. 15:6-10.

Plaintiff did not have a medical order (AVO) to show the transportation officers. *Id.*, p. 28:5-7.

Plaintiff cannot recall that he ever spoke directly to Defendant Gunn about his desire to travel by van with padded seats rather than by chain bus. *Id.*, pp. 17:22-25 - 18:1. Plaintiff never heard any of the transportation officers speak with Defendant Gunn about the issue. *Id.*, pp. 3-8.

Plaintiff never saw Defendant Gunn at the scene of transport at WTSP. *Id.*, p. 18:6-10.

Plaintiff sued Defendant Gunn because he was the supervisor over transportation. *Id.*, p. 17:1-8. Plaintiff claims that he made Defendant Gunn aware of the issue through the grievance procedure and asserts that Defendant Gunn was not responsive. *Id.*, p. 17:8-13.

Plaintiff did not sustain any injury from being transported between WTSP and DSNF by chain bus, but claims that the travel caused discomfort. *Id.,* p. 37:1-3, 37:5-7.

## D.  Affidavit of Kevin Gunn ("Gunn Aff.")

At all times relevant to the case at bar, Kevin Gunn was a TDOC Lieutenant, who was not present at the scene of Plaintiff's transportation to and from WTSP and DSNF and had no personal involvement therein, and who had no authority to order that Plaintiff be transported by a van with padded seats rather than by chain bus, as that is a medical decision made by doctors, physician assistants, and nurse practitioners, who are the only people with the authority to order such transportation. Docket No. 167-1, ¶¶ 2-7.

## E.  Affidavit of Diane Henson ("Henson Aff.")

Diane Henson is TDOC secretary to the WTSP Warden and as such, has knowledge of the following: Edison, the computer time-keeping program for WTSP, shows that Defendant Gunn was on FMLA leave and therefore absent from work on May 1, 2013. Docket No. 167-3, ¶¶ 2-3.

## F.  Affidavit of Darrell Thomas ("Thomas Aff.")

At all times pertinent to the instant action, Darrell Thomas was the TDOC medical transportation coordinator at DSNF, whose job duties consisted of coordinating inmates' schedules and transports for doctor appointments at DSNF or outside medical facilities. Docket No. 167-2, ¶¶ 2-4. Defendant Thomas' duties did not include transporting inmates from DSNF

to other prison facilities, including WTSP. *Id.*, ¶ 5. Defendant Thomas had no authority over whether Plaintiff was transported by a van or chain bus, as that is a medical decision, and transportation by van with padded seats requires a medical order (AVO) instructing for such transport. *Id.*, ¶¶6-7.

Defendant Thomas has never seen or met Plaintiff, was not at the scene of transport between DSNF and WTSP, and was not involved in the transport of inmates to other prisons. *Id.*, ¶ 8.

Because inmates can use blankets to harm themselves or others, inmates are not allowed to have blankets during transport unless there is a medical order (AVO) for it. *Id.*, ¶ 9. Additionally, DSNF blankets belong to DSNF. *Id.*

## G. Plaintiff's Affidavit ("Plaintiff's Aff.")[3]

TDOC Policy #113.04(V) states: "Inmates identified as having any medical or dental conditions that require evaluation and/or treatment beyond that which is available at his/her institution shall be released and/or transferred to another institution where such care is available." Docket No. 196, ¶ 4.

TDOC Policy #113.34(VI)(F) states: "Continuity of care is required from admission to discharge from the institution, including referral to specialty care when indicated. When an inmate is transferred from (TPW) Tennessee Prison for Women, (DSNF), or a local community hospital back to the sending institution, copies of discharge summaries, medication orders,

---

[3] Many of the "facts" contained in Plaintiff's Affidavit are conclusory, hearsay, legal conclusions, recounted legal snippets, or recounted TDOC "policies." *See* Docket No. 196, p. 3-15. Those are not "facts" that can be used to overcome a Motion for Summary Judgment, and have not been recounted herein.

treatment plans, etc., shall accompany the inmate and the required level of care shall be maintained." *Id.*, ¶ 5.

TDOC Policy #113.12 states: Once the specialty consultation has been completed and unless the inmate needs additional care or procedures immediately, the inmate shall be returned to the sending institution. *Id.*, ¶ 7.

TDOC Policy #113.12(V) states: "Consultation by a medical specialist . . . , as well as any prescribed treatment, shall be made available when it is determined that an inmate requires speciality care beyond the training or expertise of the institutional health care staff or institutional resources." *Id.*, ¶ 24.

The contract between TDOC and Corizon, Inc., states in part: "All health care must also conform with any . . . consent agreements, and Tennessee Department of Correction policies whether currently existing or as may be enacted, rendered, issued or amended during the term of the contract." *Id.*, ¶ 26.

Plaintiff was brutally beaten and sustained serious injuries. *Id.,* ¶ 48.

Dr. Baker is an orthopedic specialist who examined Plaintiff and who "specializes in injuries (or) disorders of the skeletal system." *Id.*, ¶¶ 8, 9. Defendant Bernard is not an orthopedic specialist and he cleared Plaintiff for transfer back to WTSP. *Id.*, ¶ 12.

Dr. Moore requested that Plaintiff be given physical therapy. *Id.*, ¶ 45. WTSP does not have a physical therapy unit or persons who specialize in physical therapy, but DSNF does. *Id.*, ¶¶ 6, 25. Plaintiff never refused physical therapy or treatment. *Id.*, ¶ 34.

Plaintiff "refused to be subjected to continuous pain" by being transported in the transportation bus without padded seats. *Id.*, ¶ 35. Plaintiff continues to experience pain in his

lower back and continues to "report the problem." *Id.*, ¶ 42. Plaintiff did not experience and "problems (or) pains with his back," prior to being beaten by 4 gang members. *Id.*, ¶ 43.

Once back at WTSP, Plaintiff was again placed on narcotic pain medication and muscle relaxers. *Id.*, ¶ 44.

Plaintiff has seen an orthopedist, but has "not seen a spine specialist," as recommended by Dr. Baker. *Id.*, ¶¶ 8, 47, 51.

### III.  Analysis

#### A.  Local Rules 7.01(b) and 56.01(c) and (g)

Local Rule 7.01(b) states, in pertinent part:

> Each party opposing a motion shall serve and file a response, memorandum, affidavits, and other responsive material not later than fourteen (14) days after service of the motion, except, that in cases of a motion for summary judgment, that time shall be twenty-one (21) days after the service of the motion, unless otherwise ordered by the Court.  Failure to file a timely response shall indicate that there is no opposition to the motion.

The Transportation Defendants filed the pending Motion on January 28, 2015.  Docket No. 167.  Plaintiff has failed to respond to that Motion.  Accordingly, there is no opposition to the Transportation Defendants' Motion for Summary Judgment.[4]

Additionally, with respect to Motions for Summary Judgment specifically, Local Rules 56.01(c) and (g) state, in pertinent part:

> c.  Any party opposing the motion for summary judgment must respond to each fact set forth by the movant ...
>
> . . .

---

[4] As discussed above, Plaintiff did file a Response and supporting materials opposing the Corizon Defendants' Motion for Summary Judgment.  Docket Nos. 196 - 196-4.

> g. Failure to respond to a moving party's statement of material
> facts, or a non-moving party's statement of additional facts, within
> the time periods provided by these Rules shall indicate that the
> asserted facts are not disputed for the purposes of summary
> judgment.

Plaintiff has also failed to respond to the Transportation Defendants' Statement of

Undisputed Material Facts in Support.[5] Pursuant to Local Rule 56.01(g), Plaintiff's failure to

respond indicates "that the asserted facts are not disputed for the purposes of summary

judgment." Accordingly, there is no genuine dispute as to any material fact with regard to the

Transportation Defendants and all that remains to be determined is whether the Transportation

Defendants are entitled to a judgment as a matter of law.

## B. Summary Judgment Standards

It would be inappropriate to grant the Transportation Defendants' Motion solely on the

ground that Plaintiff has failed to respond. *See Stough v. Mayville Community Schools*, 138 F.3d

612, 614 (6th Cir. 1998). As the Sixth Circuit has stated:

> [A] district court cannot grant summary judgment in favor of the
> movant simply because the adverse party has not responded. The
> Court is required, at a minimum, to examine the movant's Motion
> for Summary Judgment to ensure that he has discharged [his
> initial] burden ... The federal rules require that the party filing a
> Motion for Summary Judgment "always bears the burden of
> demonstrating the absence of a genuine issue as to a material fact."

*Id.* (citations omitted). The Court will, therefore, consider whether all Defendants (both

Transportation and Corizon) have met their burdens under the appropriate summary judgment

---

[5] As noted, Plaintiff did respond to the Corizon Defendants' Statement of Undisputed
Facts. That response failed to contain the requisite citations to the record. Because Plaintiff is
proceeding pro se, however, and submitted his properly sworn Affidavit, the undersigned will
consider Plaintiff's responses to the Corizon Defendants' Statement of Undisputed Facts.

standards discussed below.

Under Fed. R. Civ. P. 56(c), summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." A dispute is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).

In order to prevail on a Motion for summary judgment, the moving party must meet the burden of proving the absence of a genuine issue as to material fact concerning an essential element of the opposing party's claim. *Celotex v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). In determining whether the moving party has met its burden, the Court must view the evidence in the light most favorable to the nonmoving party. *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986).

Fed. R. Civ. P. 56 provides that the nonmoving party may not rest upon the mere allegations or denials of his or her pleading, but his or her response, by affidavits or otherwise, must set forth specific facts showing that there is a genuine issue for trial. If a nonmoving party, however, fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, there is no genuine issue as to any material fact because a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. *Celotex*, 477 U.S. at 322-23, 106 S. Ct. at 2552, 91 L. Ed. 2d at 273. When this occurs, the moving party is entitled to

summary judgment as a matter of law.  *Id.* at 322-23, 106 S. Ct. at 2552; *Williams v. Ford Motor Co.,* 187 F.3d 533, 537-38 (6th Cir. 1999).

## C.  42 U.S.C. § 1983

### 1.  Generally

Plaintiff alleges violations of his Eighth Amendment rights pursuant to 42 U.S.C. § 1983.

*See* Docket No. 1.  Section 1983 provides, in part, that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress...

Thus, in order to state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law.  *West v. Atkins*, 487 U.S. 42, 48, 108 S. Ct. 2250, 2254-55 (1988)*, citing Parratt v. Taylor,* 451 U.S. 527, 535, 101 S. Ct. 1908, 1913, 68 L. Ed. 2d 420 (1981) (overruled in part on other grounds, *Daniels v. Williams,* 474 U.S. 327, 330-331, 106 S. Ct. 662, 88 L. Ed. 2d 662 (1986)); *Flagg Bros., Inc. v. Brooks,* 436 U.S. 149, 155, 98 S. Ct. 1729, 1733, 56 L. Ed. 2d 185 (1978).  The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law."  *Id.* at 49, 108 S. Ct. 2255*, quoting United States v. Classic,* 313 U.S. 299, 326, 61 S. Ct. 1031, 1043, 85 L. Ed. 1368 (1941).

**2. Eighth Amendment**

**a. Generally**

The Eighth Amendment provides that:

> Excessive bail shall not be required, nor excessive fines imposed,
> nor cruel and unusual punishments inflicted.

U.S. Const. amend. VIII.

The United States Supreme Court has held that the constitutional prohibition of "cruel and unusual punishments" forbids punishments that are incompatible with "the evolving standards of decency that mark the progress of a maturing society," or which "involve the unnecessary and wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. 97, 102-03, 97 S. Ct. 285, 290, 50 L. Ed. 2d 251 (1976) (citations omitted).

In order to establish an Eighth Amendment claim, an inmate must satisfy a two-prong test: (1) the deprivation alleged must be objectively serious; and (2) the official responsible for the deprivation must have exhibited deliberate indifference to the inmate's health or safety. *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S. Ct. 1970, 1977, 128 L. Ed. 2d 811 (1994).

**b. Deliberate Indifference To Serious Medical Needs**

The State has a constitutional obligation, under the Eighth Amendment, to provide adequate medical care to those whom it has incarcerated. *Estelle,* 429 U.S. at 104, 97 S. Ct. at 291.

"[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Estelle,* 429 U.S. at 104. This is true "whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or

intentionally interfering with the treatment once prescribed." *Id*. at 104-05.

Not every prisoner's allegation of inadequate medical treatment, however, is a violation of the Eighth Amendment. *Estelle,* 429 U.S. at 105. For instance, courts have held that the accidental, inadvertent, or negligent failure to provide adequate medical care does not state such a claim. *Id.* at 105-06 (citations omitted).

Pursuant to Supreme Court precedent, the Sixth Circuit held, in *Hunt v. Reynolds*, that Eighth Amendment deliberate indifference claims must contain both an objective component, "that [plaintiff's] medical needs were sufficiently serious," and a subjective component, "that the defendant state officials were deliberately indifferent to the plaintiff's needs." 974 F.2d 734, 735 (6th Cir. 1992) (citations omitted).

In order to satisfy the objective requirement, the Supreme Court requires that an inmate demonstrate evidence of a current harm or evidence of a medical complaint or condition of confinement that "is sure or very likely to cause serious illness and needless suffering." *Helling v. McKinney*, 509 U.S. 25, 33, 113 S. Ct. 2475, 2480, 125 L. Ed. 2d 22 (1993). Under the Eighth Amendment, inmate plaintiffs, must allege, at the very least, unnecessary pain or suffering resulting from prison officials' deliberate indifference. *Id*. (prisoner alleging that he suffered pain and mental anguish from delay in medical care states a valid Eighth Amendment claim).

As for the subjective element, the Sixth Circuit has held that "a determination of deliberate indifference does not require proof of intent to harm." *Weeks v. Chaboudy*, 984 F.2d 185, 187 (6th Cir. 1993). There must, however, be a showing of deliberate indifference to an inmate's serious medical needs. *Molton v. City of Cleveland*, 839 F.2d 240, 243 (6th Cir. 1988) (*citing Westlake v. Lucas*, 537 F. 2d 857, 860 n. 3 (6th Cir. 1976)). In fact, "[k]nowledge of the asserted serious needs

or of circumstances clearly indicating the existence of such needs, is essential to a finding of deliberate indifference." *Horn v. Madison County Fiscal Court*, 22 F.3d 653, 660 (6th Cir. 1994) (citations omitted). The inquiry, therefore, according to the Sixth Circuit, is "[w]as this individual prison official aware of the risk to the inmate's health and deliberately indifferent to it?" *Thaddeus-X*, 175 F.3d at 402 (*citing Farmer v. Brennan*, 511 U.S. 825, 837, 844, 114 S. Ct. 1970, 1979, 1982-83, 128 L. Ed. 2d 811 (1994)).

### E. The Case at Bar

#### 1. Transportation Defendants' Motion for Summary Judgment (Docket No. 167)

As noted, Plaintiff sues Defendant Gunn as the WTSP transportation supervisor who made him ride on a chain bus without padded seats during transport between WTSP and DSNF, and Defendant Thomas as the DSNF transportation supervisor who once refused to allow him to bring a blanket on the bus. Docket No. 1; Plaintiff's Dep., pp. 6:24-45; 7:1-7; 12:19-25.

As an initial matter, at all times relevant to the instant action, the Transportation Defendants were TDOC employees. *See* Gunn Aff., ¶ 2; Thomas Aff., ¶ 2. In complaints alleging federal civil rights violations under § 1983, "[a]n official capacity claim filed against a public employee is equivalent to a lawsuit directed against the public entity which that agent represents." *Claybrook v. Birchwell*, 199 F.3d 350, 355 n.4 (6th Cir. 2000) (*citing Kentucky v. Graham*, 473 U.S. 159, 165 (1985)). *See also, Frost v. Hawkins County Bd. of Educ.*, 851 F.2d 822, 827 (6th Cir. 1988). As such, when a public employee is sued in his or her official capacity, the claims are essentially made against the public entity. *Id*. Because the Transportation Defendants were employees of TDOC, which is a department of the State of Tennessee, they stand in the shoes of the State of Tennessee. The State of Tennessee is not a "*person*" amenable to suit under § 1983. *Will v. Michigan Dep't of*

*State Police*, 491 U.S. 58, 71 (1989).

Additionally, the State of Tennessee has not waived its immunity under the Eleventh Amendment with respect to civil rights suits. *ACLU v. Tennessee*, 496 F.Supp. 218 (M.D. Tenn. 1980).

For these reasons, Plaintiff cannot sustain his official capacity claims against the Transportation Defendants, and they are entitled to a judgment as a matter of law.

Moreover, with regard to Plaintiff's claims against the Transportation Defendants in their individual capacities, 42 U.S.C. § 1983 does not provide for the imposition of liability based upon a theory of *respondeat superior*. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691-94 (1978). In order to establish individual liability under § 1983, therefore, Plaintiff must demonstrate that the Transportation Defendants either directly participated in the activity that allegedly violated his Constitutional rights, or personally authorized, approved, or acquiesced in such activity. *See, e.g., Bellamy v. Bradley*, 729 F.2d 416, 421 (6ᵗʰ Cir. 1984); *Dunn v. State of Tennessee*, 697 F.2d 121, 128 (6ᵗʰ Cir. 1983); *Hays v. Jefferson County*, 668 F.2d 869 (6ᵗʰ Cir. 1980). Plaintiff must allege "a causal connection between the misconduct complained of and the official sued" (*Dunn*, 697 F.2d at 128), and must present affirmative evidence that the Transportation Defendants violated his rights; conclusory allegations are not enough (*see Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989)). *See also, Anderson,* 477 U.S. at 257; *Nix v. O'Malley,* 160 F.3d 343, 347 (6th Cir. 1998); *Lujan v. National Wildlife Fed'n,* 497 U.S. 871, 888, 110 S. Ct. 3177, 3188, 111 L. Ed. 2d 695 (1990); *McDonald v. Union Camp Corp.,* 898 F.2d 1155, 1162 (6th Cir. 1990).

The undisputed facts establish that Plaintiff sued Defendant Gunn because he was the WTSP Transportation Supervisor, but he never spoke directly to Defendant Gunn about his transport,

never saw Defendant Gunn at the scene of transport, and never heard any officer speak with Defendant Gunn about the issue. Plaintiff's Dep., pp. 17:1-8, 22-25; 18:1, 6-10; 22:3-8. Although Plaintiff claims that he made Defendant Gunn aware of the transportation issue through the grievance process, the failure to investigate a grievance is insufficient to sustain a claim against the supervisor (*Shehee v. Luttrell*, 199 F.3d 295, 300 6th Cir. 1999), and it is undisputed that Defendant Gunn had no personal involvement in Plaintiff's transport and no authority to order that Plaintiff be transported in a van with padded seats, rather than by chain bus, as that is a medical decision made by the doctors, physician assistants, and nurse practitioners, who issue a medical order (AVO) for such transport. Gunn Aff., ¶¶ 4-7; Thomas Aff., ¶ 7. It is additionally undisputed that Plaintiff's TDOC medical records do not contain any AVO's regarding Plaintiff's transport (TDOC Med. Rec.); that Plaintiff testified that he did not have an AVO to show the transportation officers (Plaintiff's Dep., p. 28:5-7); that there was no medical basis for transporting Plaintiff by van with padded seats instead of by chain bus (Bernard Aff., ¶ 19); and that Plaintiff did not sustain any injury beyond discomfort from being transported between WTSP and DSNF by chain bus (Plaintiff's Dep., p. 37:1-7). Accordingly, Plaintiff cannot sustain his individual capacity claims against Defendant Gunn, and he is entitled to a judgment as a matter of law.

With regard to Plaintiff's individual capacity claim against Defendant Thomas, the undisputed facts establish that Defendant Thomas was the TDOC medical transportation coordinator at DSNF, but has never seen or met Plaintiff, was not at the scene of transport, and was not involved in the transport. Thomas Aff., ¶ 8. It is further undisputed that Defendant Thomas had no authority to order that Plaintiff be transported in a van with padded seats, rather than by chain bus, because that is a medical decision made by the doctors, physician assistants, and nurse

practitioners, who issue an AVO for such transport (Thomas Aff., ¶¶ 2, 6-7); that because inmates can use blankets to harm themselves or others, inmates are not allowed to have blankets during transport unless there is an AVO for it (Thomas Aff., ¶ 9); that Plaintiff's TDOC medical records do not contain any AVO's regarding Plaintiff's ability to have a blanket during transport or means of transport (TDOC Med. Rec.); that Plaintiff testified that he did not have an AVO to show the transportation officers (Plaintiff's Dep., p. 28:5-7); that there was no medical basis for transporting Plaintiff by van with padded seats instead of by chain bus (Bernard Aff., ¶ 19); and that Plaintiff did not sustain any injury beyond discomfort from being transported between WTSP and DSNF by chain bus (Plaintiff's Dep., p. 37:1-7). Plaintiff, therefore, likewise cannot sustain his individual capacity claims against Defendant Thomas, and Defendant Thomas is entitled to a judgment as a matter of law.

## 2. Corizon Defendants' Motion for Summary Judgment (Docket No. 173)

Plaintiff sues Defendant Bernard because he did not renew Plaintiff's narcotic pain medication, did not follow the recommendations of other physicians, and cleared him for transport in a regular bus. *See* Docket No. 1; Plaintiff's Dep. Plaintiff sues Corizon, Inc. because he avers that Defendant Bernard, as an independent contractor contracting with Corizon, acted as he did pursuant to Corizon's policies, practices, or customs. *Id.*

With regard to Defendant Bernard, the undisputed facts establish in pertinent part as follows:

Defendant Bernard is a medical doctor licensed to practice in the State of Tennessee who was employed by Corizon, Inc. to provide medical services to TDOC inmates. Bernard Aff., ¶ 1. He is not an orthopedic specialist. Plaintiff's Aff., ¶ 12. He is familiar with the standard of care applicable to medical doctors practicing in the community or in a similar community at the time of

the matters raised in Plaintiff's Complaint. Bernard Aff., ¶ 22. The care that Defendant Bernard and the other doctors provided met or exceeded the applicable standard of care. *Id.* Defendant Bernard acted at all times in good faith and made the independent medical decisions he believed to be appropriate concerning Plaintiff. *Id.* At no time did Defendant Bernard consciously ignore or refuse to address any serious medical need of Plaintiff of which he was aware. *Id.*

After being contacted by a nurse regarding the expiration of Plaintiff's pain medication, Defendant Bernard gave a voice order for Plaintiff to receive Motrin 600 mg. 3 times a day for 10 days. *Id.*, ¶¶ 12, 21. The prescription of Motrin was Defendant Bernard's normal practice for a patient with Plaintiff's presentation, and it was Defendant Bernard's opinion that Motrin was appropriate for Plaintiff's condition as it was described in the reports he had read and the x-rays he reviewed. *Id.*, ¶ 21. Relying on the records he had reviewed and very likely the report of the nurse who would have contacted him is normal practice that meets or exceeds the standard of care. *Id.* The decisions Defendant Bernard made concerning Plaintiff's medication were based on his independent medical judgment. *Id.*

Outside specialists cannot issue orders; rather, it would be up to Plaintiff's prison doctors to decide whether Dr. Baker's recommendations would be adopted. *Id.*, ¶¶ 6, 16. Plaintiff's principal treating physician, Dr. Moore was coordinating and managing Plaintiff's care for all of his conditions, and it is up to Dr. Moore to make decisions regarding the need for, and timing of, any diagnostic testing, treatment, or consultations with specialists. *Id.*, ¶ 16. Once Dr. Moore requested specialized services, the services were subject to utilization management review before final approval and scheduling. *Id.* The handling of Plaintiff's specialized consultations was done within the standard of care and was wholly appropriate. *Id.*, ¶ 18.

Defendant Bernard did not schedule transfers between the prisons and the Transit Unit, as that is handled by the prison security staff. *Id.*, ¶ 19. Defendant Bernard was not made aware of any condition of Plaintiff that required him to be transferred in any specialized manner, and, before clearing Plaintiff for transfer, Defendant Bernard reviewed the orthopedic and ENT notes and the cervical and lumbar x-ray reports. *Id.* These records did not provide any medical basis for transferring Plaintiff in a special manner; the records do not contain an order for specialized transport; and there is no evidence that by medically clearing Plaintiff to be transported caused Plaintiff any harm. *Id.*, ¶¶ 17, 19, 20; Plaintiff's Dep., pp. 28:5-7, 37:1-7.

As it is undisputed that Defendant Bernard's independent decisions were medically appropriate and met the applicable standard of care, and that he acted at all times in good faith, made the independent medical decisions he believed to be appropriate, and at no time consciously ignored or refused to address any serious medical need of Plaintiff of which he was aware, Plaintiff cannot establish that Defendant Bernard violated his Eighth Amendment rights. Accordingly, Defendant Bernard is entitled to a judgment as a matter of law.

Because Plaintiff cannot sustain his claim against Defendant Bernard, he cannot sustain his claim against Corizon, Inc. as Defendant Bernard's employer. Moreover, Plaintiff cannot establish that an official Corizon custom, policy, or practice violated his rights or caused him injury. It is undisputed that Corizon did not have a custom, policy, or practice to allow medication prescriptions to expire without renewal or to deny the prescription of medically indicated medication. *Id.*, ¶ 21. The medical records show that Plaintiff was consistently prescribed medication different providers deemed to be medically indicated. *Id.* The decisions Defendant Bernard made concerning Plaintiff's medication were not based on any specific direction from

Corizon. *Id.* It is also undisputed that Corizon did not have any custom, policy, or practice to deny or delay medically indicated testing, consultations, or treatment. *Id.*, ¶ 18. While specialized services required review through the utilization management process, this is not unusual and is within the standard of care. *Id.* Plaintiff received specialized services which Defendant Bernard's review of the medical records shows to have been handled in a manner that met or exceeded the standard of care. *Id.* Finally, it is undisputed that Plaintiff did not sustain any injury beyond discomfort from being transported between WTSP and DSNF by chain bus. Plaintiff's Dep., p. 37:1-7.

Because Plaintiff cannot establish an underlying constitutional violation, much less that an official Corizon custom, policy, or practice violated his rights or caused him injury, Corizon, Inc. Is likewise entitled to a judgment as a matter of law.

## IV. Conclusion

For the foregoing reasons, the undersigned concludes that, viewing the facts and inferences in favor of the non-moving party, there is no genuine issue of any material fact and Defendants are entitled to a judgment as a matter of law. Accordingly, the undersigned recommends that Defendants' Motions for Summary Judgment (Docket Nos. 167, 173) be GRANTED, and that this action be DISMISSED. Because the undersigned recommends that Plaintiff's federal claims be dismissed, the undersigned further recommends that the Court decline to exercise its pendent jurisdiction over Plaintiff's negligence claims.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has fourteen (14) days after service of this Report and Recommendation in which to file any written objections to this Recommendation with the District Court. Any party opposing said objections shall have fourteen

(14) days after service of any objections filed to this Report in which to file any response to said objections.  Failure to file specific objections within fourteen (14) days of service of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation.  *See Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L. Ed. 2d 435 (1985), *reh'g denied*, 474 U.S. 1111 (1986); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.


_____
E. CLIFTON KNOWLES
United States Magistrate Judge