IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

JOHNNY L. McGOWAN, JR.,       )
                            )
      Plaintiff,           )
                            )
v.                           )       No. 3:14-cv-0578
                            )       Judge Trauger
CORIZON MEDICAL, LT. KEVIN GUNN,   )       Magistrate Judge Knowles
DR. CLEMENT BARNARD, and      )
DARREL THOMAS,           )
                            )
      Defendants.        )

## MEMORANDUM OPINION

Before the court is Magistrate Judge Cliff Knowles' Report and Recommendation ("R&R") (ECF No. 244), recommending that the separate motions for summary judgment filed by defendants Kevin Gunn and Darrell Thomas (the "Transportation Defendants") (ECF No. 167) and by defendants Corizon Medical ("Corizon") and Dr. Clement Bernard (collectively, the "Corizon Defendants") (ECF No. 173) be granted and that judgment be entered in favor of the defendants. Plaintiff Johnny L. McGowan, Jr., has filed objections to the R&R. (ECF No. 265.)

As set forth herein, the court overrules the plaintiff's objections to the recommendation that the Transportation Defendants' motion for summary judgment be granted. The court has conducted a *de novo* review of the record and the filings related to the Transportation Defendants' motion for summary judgment. Because the undisputed facts clearly establish that these defendants are entitled to judgment in their favor as a matter of law, the court will accept the recommendation that the Transportation Defendants' motion for summary judgment be granted.

Regarding the Corizon Defendants' motion, the court finds that disputed issues of fact preclude summary judgment of the plaintiff's claim that Dr. Clement Bernard was deliberately indifferent to his serious medical needs when he authorized the plaintiff's transport back to West Tennessee State Penitentiary ("WTSP") from DeBerry Special Needs Facility ("DSNF") in March 2013 on a regular prison bus ("chain bus") without padded seats. In all other respects the court will accept the R&R and grant summary judgment in favor of Corizon and Dr. Bernard.

I.        BACKGROUND

        The plaintiff instituted this action in June 2013 in the United States District Court for the Western

District of Tennessee against numerous defendants. The claims against the Corizon and Transportation

Defendants were severed and transferred to this court. The Transportation Defendants filed their motion

for summary judgment on January 28, 2015 (ECF No. 167). Although he sought and was granted several

extensions of the deadline for doing so (*see* ECF Nos. 293, 303 (granting two separate motions to extend

the deadline by 45 and 30 days, respectively)), the plaintiff never filed a response in opposition to the

Transportation Defendants' motion. The plaintiff has asserted that he needs additional discovery in order

to respond properly to the Transportation Defendants' motion, but the motions for such discovery have

been denied, and the court overruled objections to the denial of such motions.

        The Corizon Defendants filed their motion for summary judgment on February 2, 2015 (ECF No.

173). The plaintiff filed a response in opposition to this motion. (ECF No. 196.)

        On August 17, 2015, Magistrate Judge Knowles filed his R&R recommending that both motions

be granted. The plaintiff has now filed objections to the R&R (ECF No. 265), asserting, with respect to the

Transportation Defendants' motion, that:

> (1) the magistrate judge erred in failing to appoint counsel, which would have allowed him
> to obtain evidence to meet his burden under the summary judgment standard and to
> respond properly to the Transportation Defendants' motion;
>
> (2) the magistrate judge erred in finding that the Transportation Defendants in their official
> capacity were immune from suit for prospective injunctive relief; and
>
> (3) TDOC policies and procedures, the discovery of which has been denied to the plaintiff
> for "security reasons," will prove that the Transportation Defendants were "personally
> authorized to approve each of the plaintiff's transfers in this case" (ECF No. 265, at 2).

        The plaintiff's objections to the recommendation that the Corizon Defendants' motion be granted

are as follows:

> (1) Defendant Bernard is not entitled to summary judgment in his favor on the plaintiff's
> claims because the plaintiff has established a disputed issue of fact as to whether the
> plaintiff had a sufficiently serious medical need of which Dr. Bernard was subjectively
> aware and consciously or deliberately disregarded when he
>
>> (a) failed to prescribe adequate pain medication in a timely fashion;
>>
>> (b) violated TDOC regulations when he disregarded Dr. Baker's treatment
>> recommendations and sent the plaintiff back to WTSP without letting him undergo
>> physical therapy; and

(c) cleared the plaintiff for transport back to WTSP on a prison transportation bus with unpadded seats; and

(2) Dr. Bernard was in a policymaking role as an employee of Corizon, which supports damages against Corizon.

(ECF No. 265, at 4–8.)

## II. STANDARD OF REVIEW

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986) (citing Fed. R. Civ. P. 56(c)). The burden of showing the absence of any genuine issue of material fact rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits," if any, which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex*, 477 U.S. at 323 (quoting Fed. R. Civ. P. 56(c)). A fact is "material only if its resolution will affect the outcome of the lawsuit." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

Once the moving party has satisfied its burden of proof, the burden then shifts to the nonmoving party. However, as the magistrate judge recognized, it is not appropriate to grant a motion for summary judgment solely on the basis that the non-moving party failed to respond. As the Sixth Circuit has stated:

> [A] district court cannot grant summary judgment in favor of the movant simply because the adverse party has not responded. The court is required, at a minimum, to examine the movant's motion for summary judgment to ensure that he has discharged [his initial] burden. . . . The federal rules require that the party filing a motion for summary judgment always bears the burden of demonstrating the absence of a genuine issue as to a material fact . . . regardless if an adverse party fails to respond.

*Stough v. Mayville Cmty. Schs.*, 138 F.3d 612, 614 (6th Cir. 1998) (citations and internal quotation marks omitted). In accordance with this guidance, the court will examine the defendants' motion to determine whether they have established that they are entitled to judgment in their favor.

## II. THE TRANSPORTATION DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### A. Relevant Facts

The magistrate judge included an exhaustive statement of the facts in evidence in his R&R, which the court adopts insofar as the facts pertain to the Transportation Defendants' motion. The court summarizes here only the most pertinent facts relevant to that motion.

The plaintiff's claims arise from an assault by other inmates that took place in February 2013, when the plaintiff was housed at WTSP. The plaintiff suffered a number of fairly serious injuries in the assault, including diffuse soft-tissue swelling of the scalp; small blowout fracture of the medial orbital wall; fracture of the left L-3 and L-4 transverse processes, without neurological involvement; right tympanic membrane rupture; and neck strain, along with other more minor injuries. As relevant here, the plaintiff's transportation to and from WTSP for medical treatment related to the assault gave rise to claims against the "Transportation Defendants" (Gunn and Thomas).

The plaintiff alleges generally that Gunn and Thomas were transportation supervisors who made him ride on a chain bus without padded seats back and forth between WTSP and DSNF, where he was having his altercation injuries treated from March to May 2013. (ECF No. 167-4, Pl.'s Dep. 6:24–45, 7:1–7.) He alleges that defendant Thomas was the DSNF transportation supervisor who once refused to allow him to bring a blanket on the bus (*Id.* 12:19–25). He claims that Gunn was the "supervisor over transportation in West Tennessee" to whom the plaintiff submitted grievances related to his transportation but that Gunn ignored his complaints even though, the plaintiff alleges, "he had the authority to have [him] placed on transportation—on the . . . van with the padded seats." (*Id.* at 17:7–14.) The plaintiff conceded that the only basis for his belief that Gunn had that authority was because other officers told him that it was "up to" Gunn and because Gunn was in a supervisory position. (*Id.* at 17: 16–17, 18: 20–21.) He did not recall ever speaking directly to Gunn about the issue, and Gunn was never present when the plaintiff was being transported.

For his part, Gunn testified that he was never present at the scene of the plaintiff's transportation to or from WTSP and had no personal involvement in his transportation and, more importantly, that he had no authority to order that the plaintiff be transported by van with padded seats rather than by chain bus. According to Gunn, only medical providers could order that a prisoner be transported by one means over another. (ECF No. 167-1, Gunn Aff. ¶¶ 2–7.) Defendant Thomas testified that he was the TDOC medical transportation coordinator at DSNF. As such, his job duties consisted of coordinating and scheduling inmates' transportation between DSNF and outside medical facilities. He was not involved in inmates' transportation between DSNF and other prisons. (ECF No. 167-2, Thomas Aff. ¶¶ 2–5.) In

addition, he testified that, as a matter of policy, inmates are not allowed to have blankets during transport unless there is a medical order permitting it. (*Id.* at ¶ 9.)

Plaintiff's TDOC medical records contain no medical orders (AVO's) prohibiting travel by chain bus.

### B. Analysis

As grounds for their motion for summary judgment, the Transportation Defendants argue that: (1) as TDOC employees, they have Eleventh Amendment immunity and are not "persons" subject to suit under § 1983 in their official capacities; (2) *respondeat superior* is not a basis for the imposition of liability under § 1983, and the plaintiff has not averred that Gunn was personally involved in the disputed decisions; (3) the transportation claims fail to state a violation of the Eighth Amendment based on the plaintiff's conditions of confinement; (4) the plaintiff's transportation claims fail to state an Eighth Amendment claim based on deliberate indifference to his serious medical needs; (5) because he suffered no physical injury as a result of his transportation, the plaintiff's claims are barred by the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(e); (6) as government officials acting in good faith in their official capacities, they are qualifiedly immune from suit; and (7) pursuant to Tenn. Code Ann. § 9-8-307(h), which provides that state employees have absolute immunity for acts or omissions within the scope of their employment, they have absolute immunity from the plaintiff's negligence claims, and the court should decline to exercise supplemental jurisdiction over those claims. (ECF No. 168.)

#### 1. The Official-Capacity Claims

Based on the record before him, the magistrate judge found, and this court agrees, that, insofar as the plaintiff brings suit against the Transportation Defendants in their official capacity, they are immune from such liability. These defendants are TDOC employees. "[A] [§ 1983] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office," *i.e.*, against the State. *Will v. Mich. Dept. of State Police*, 491 U.S. 58, 71 (1989). Because the Transportation Defendants were employees of TDOC, which is a department of the State of Tennessee, they stand in the shoes of the State of Tennessee. The State of Tennessee is not a "person" amenable to suit under § 1983. *Id.* Moreover, the state of Tennessee and its agencies are immune from suit pursuant to the Eleventh Amendment. *Quern v. Jordan*, 440 U.S. 332, 340–45 (1979); *see Lawson v. Shelby Cnty.,*

*Tenn.*, 211 F.3d 331, 335 (6th Cir. 2000) ("[T]he [Eleventh] Amendment prohibits suits against a 'state' in federal court whether for injunctive, declaratory or monetary relief."). The only exceptions to a state's immunity are (1) if the state has consented to suit or (2) if Congress has properly abrogated a state's immunity. *S & M Brands, Inc. v. Cooper*, 527 F.3d 500, 507 (6th Cir. 2008). Neither of these exceptions applies to § 1983 suits against the state of Tennessee. *See Berndt v. Tennessee*, 796 F.2d 879, 881 (6th Cir. 1986) (noting that Tennessee has not waived immunity to suits under § 1983); *Hafer v. Melo*, 502 U.S. 21, 25 (1991) (reaffirming that Congress did not abrogate states' immunity when it passed § 1983).

The only other exception is when the *Ex parte Young* exception applies. *See S&M Brands*, 527 F.3d at 507. Under this exception, "a federal court can issue prospective injunctive and declaratory relief compelling a state official to comply with federal law." *Id.* (quoting *Will*, 491 U.S. at 71 & n.10). It is apparently this exception the plaintiff seeks to invoke in his objection to the recommendation that his official-capacity claims be dismissed on immunity grounds. His objection is unfounded, because, although he seeks equitable relief in the form of the "immediate termination" of defendants' jobs and revocation of their pensions (*see* Complaint, ECF No. 1, at 15), this is not the type of prospective injunctive relief permitted by the *Ex part Young* exception. *See S&M Brands*, 527 F.3d at 507. The events of which the plaintiff complains took place between March and May 2013, and the plaintiff does not allege an ongoing deprivation of his rights by TDOC transportation officials. He is not entitled to prospective injunctive relief. Consequently, he cannot sustain his official-capacity claims against the Transportation Defendants.

### 2.    The Individual-Capacity Claims Against Gunn

Regarding the individual-capacity claims against defendant Gunn, the plaintiff conceded in his deposition that Gunn did not have any personal involvement in the individual decisions regarding his transportation. The plaintiff insists that Gunn had control over decisions regarding his transportation because he was a supervisor, and he also alleges that he filed grievances but that Gunn ignored his grievances. The facts that Gunn was a supervisor and that he failed to respond to grievances, even if accepted as true, are not sufficient to support an individual-capacity claim against him.

First, the doctrine of *respondeat superior*, or the right to control employees, does not apply in § 1983 actions to impute liability onto supervisors. *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978); *Taylor v. Mich. Dep't of Corr.*, 69 F.3d 76, 80–81 (6th Cir. 1995). Instead, supervisors

can be personally liable under § 1983 "only for their own unconstitutional behavior." *Colvin v. Caruso*, 605 F.3d 282, 292 (6th Cir. 2010) (quoting *Leach v. Shelby Cnty. Sheriff*, 891 F.2d 1241, 1246 (6th Cir. 1989)); *accord Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999) (stating that supervisory liability "must be based on active unconstitutional behavior and cannot be based upon 'a mere failure to act'" (quoting *Salehpour v. Univ. of Tenn.*, 159 F.3d 199, 206 (6th Cir. 1998))). Thus, "simple awareness of employees' misconduct does not lead to supervisor liability." *Leary v. Daeschner*, 349 F.3d 888, 903 (6th Cir. 2003) (citing *Lillard v. Shelby Cnty. Bd. of Educ.*, 76 F.3d 716, 728 (6th Cir. 1996)). "[E]ven if a plaintiff can prove a violation of his constitutional rights, his § 1983 claim must fail against a supervisory official unless the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it." *Cardinal v. Metrish*, 564 F.3d 794, 802–03 (6th Cir. 2009) (citations and internal quotation marks omitted). To succeed on his claim, the plaintiff must therefore show that the defendants "at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Id.* at 803 (citations omitted).

Approval or acquiescence in the form of the denial of a grievance or appeal, however, is not the type of contemporaneous encouragement and participation that can give rise to personal liability. *See Poe v. Haydon*, 853 F.2d 418, 429 (6th Cir. 1988) (holding that a supervisory official's awareness of alleged illegal conduct after the fact does not provide a basis for imposition of damages under 42 U.S.C. § 1983); *see also Martin v. Harvey*, 14 F. App'x 307, 309–10 (6th Cir. 2001) ("The denial of the grievance is not the same as the denial of a request to receive medical care."); *Shehee*, 199 F.3d at 300 (as against defendants whose only involvement was the denial of administrative remedies and the "failure to remedy the alleged retaliatory behavior," "[t]here is no allegation that any of these defendants directly participated . . . in the claimed . . . acts"); *Weaver v. Toombs*, 756 F. Supp. 335, 337 (W.D. Mich. 1989) ("The mere fact that these defendants found plaintiff's . . . grievance concerning the seizure to be without merit is insufficient to state a claim against them."). Likewise, merely being aware of a prisoner's complaint and failing to take corrective action is insufficient to impose liability on supervisory personnel under § 1983. *Poe*, 853 F.2d at 429.

The court finds, based on the undisputed facts, that defendant Gunn in his individual capacity is entitled to summary judgment in his favor.

### 3.    *The Individual-Capacity Claims Against Defendant Thomas*

Regarding defendant Thomas, there is a disputed issue of fact regarding whether Thomas was the individual who personally denied the plaintiff's request to take a blanket with him on the bus from DSNF back to WTSP on March 26, 2013. The plaintiff asserts that Thomas himself refused to allow him to take a blanket and threatened him with disciplinary action. Thomas insists that the plaintiff has mistakenly identified him and that he was never involved in the transport of inmates between TDOC facilities. This dispute is not material. Even if the court assumes that Thomas himself denied the plaintiff permission to take a blanket on the bus, the plaintiff cannot dispute Thomas's testimony that he did not have the authority to permit the plaintiff to travel with a blanket, that inmates were not permitted to take blankets on the bus without a medical order authorizing it, and that the plaintiff did not have such a medical order.[1]

### 4.    *The Discovery Issue*

The plaintiff's objections to the R&R are primarily focused on the magistrate judge's denial of his request for additional discovery, and he continues to insist that additional discovery would permit him to respond adequately to the Transportation Defendants' motion. The court finds that additional discovery would not aid the plaintiff in contesting the motion for summary judgment and that the magistrate judge's denial of the motion for additional discovery was not erroneous or contrary to law.

The magistrate judge, in denying the plaintiff's request for additional discovery in order to respond to the Transportation Defendants' motion, found as follows:

> Plaintiff asserts that there are TDOC policies and procedures "which present facts in dispute with Defendants' current positions addressed in their Motion [sic] for Summary Judgment." Docket No. 181, p. 2. He further states that he has been unable to gain access to both policies and procedures because they are "prohibited from inmates view and present security issues." He further states that there is a pending Motion for Appointment of Counsel. Id. He also states that he is prohibited from recovering "the opposing evidence captured on video footage . . . which presents other genuine issues of material facts . . . ." He claims that "under law this video footage was to be kept as long as this official proceeding is ongoing," and that "the destruction (or) tampering with this video footage constituted felony criminal offenses, including obstruction of justice . . . ." Id., p. 3. He asks that the Court allow four months for additional discovery, appoint counsel to represent him, and deny Defendants' Motions for Summary Judgment until the completion of discovery. Id., p. 4.

---

[1] The plaintiff alleges that an officer whose name he does not know allowed him to take a blanket with him on the initial trip from WTSP to DSNF. This fact does not establish that Thomas had any obligation to follow suit, because the plaintiff has not shown that there was a medical order allowing it or that Thomas had any personal knowledge about the plaintiff's medical condition.

Defendants have filed Responses in Opposition to the Motion. Docket Nos. 182, 184. Defendants point out that Plaintiff asks the Court to extend the discovery period for four months and then to allow him an additional 45-day extension to respond to the pending Motions for Summary Judgment. . . .

Defendants Gunn and Thomas also state that Plaintiff never sought production of the policies or video footage he references through the discovery process. They also state that there is no relevant computer generated video footage, because that video footage is discarded as new video is recorded, and that the video footage only lasts between 10 and 90 days. Docket No. 182, p. 1-2. The events at issue occurred in March–May, 201[3]. . . .

A schedule in a Scheduling Order can be amended only upon a showing of good cause. Fed. R. Civ. P. 16(b)(4). Plaintiff has not shown good cause for extending the discovery deadline. As discussed above, the Scheduling Order was entered June 18, 2014. Docket No. 84. The Order plainly set a deadline of January 1, 2015, for the completion of discovery. Docket No. 84. Furthermore, the Scheduling Order provided, "all discovery Motions must be filed by January 15, 2015." Docket No. 84, p. 3. The instant Motion was not filed until February 6, 2015. Plaintiff has had sufficient time in which to conduct discovery in this action. He seeks additional time for discovery, according to Defendants, in order to obtain materials that he has never asked for in the discovery process, or that no longer exists.

(ECF No. 228, at 3–6.)

With regard to the videotape, the court accepts for purposes of his motion that defendant Thomas denied him permission to take a blanket on the bus with him, so a videotape documenting that exchange would not aid the plaintiff's cause.

Regarding his request for policies and procedures, the plaintiff does not dispute that he did not ask for these in initial rounds of discovery, and it would be pure speculation at this point to posit that policies exist that would refute the statements in the defendants' affidavits. Specifically, both Gunn and Thomas testified in their affidavits that medical staff only had the authority to order that an inmate be permitted to travel with a blanket for padding or in a vehicle with padded seats. This makes sense, because transportation personnel certainly have no expertise that would permit (or require) them to study individual inmates' medical records and determine on that basis what form of transportation would be medically appropriate for them. Likewise, transportation staff had no obligation to simply take an inmate's word for it regarding that inmate's medical condition and pain level.

Moreover, the plaintiff admits that there was no medical order in his file regarding transportation. Thus, he cannot show that Thomas or Gunn was personally aware of the details of the plaintiff's medical

condition, that they had any basis for making a medical judgment about his condition, or that they had any reason to know or suspect that the plaintiff's medical condition required that he be treated specially.

        *5.*      *Conclusion*

In sum, the facts viewed in the light most favorable to the plaintiff establish that the Transportation Defendants are entitled to summary judgment on the claims against them in their individual capacity as well as in their official capacity. The plaintiff has not and cannot at this juncture establish that he is entitled to additional discovery or that further discovery would have any effect on the outcome of this motion.

**II.**        **THE CORIZON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

        **A.**        **Relevant Facts**

There is no dispute that Dr. Moore at WTSP was the plaintiff's principal treating physician with regard to all the injuries he suffered in the altercation in February 2013. (*See* ECF No. 175, Bernard Aff., and ECF No. 175-1, attached medical record.) After assessing his injuries upon the plaintiff's return from the emergency room, Dr. Moore's plan was for Plaintiff to be seen by orthopedic, ENT, and ophthalmic specialists. On February 19, 2013, Dr. Moore requested that the plaintiff be seen for orthopedic and ENT consultations. The plaintiff was transferred to the transit unit at DSNF ("Transit Unit") on March 6, 2013, in order for him to be seen by various specialists. The plaintiff was sent to the Transit Unit with a prescription for Tylenol #3, which contains a narcotic pain reliever. He still had approximately 5 days left on the prescription at the time of his transfer.

Dr. Bernard is a medical doctor licensed to practice in the State of Tennessee who, at the relevant time, was employed by Corizon, Inc. to provide medical services to TDOC inmates. Dr. Bernard did not become involved in the plaintiff's treatment until he was transferred to the Transit Unit. It is unclear whether Dr. Bernard ever personally examined the plaintiff. It appears that he did not.

On March 7, 2013, following his transfer to the Transit Unit, the plaintiff had a consultation with orthopedic specialist Dr. Ronald Baker. X-rays performed that day showed non-displaced fractures of the left L-3 and L-4 transverse processes and a minor leftward curvature, which may have been in part caused by the plaintiff's positioning. The cervical x-ray report showed no fractures, loss of disc height, or misalignment. The only positive finding was mild straightening of the lordotic curve. This is a non-specific finding that may be related to pain or muscle spasms or it may be congenital. This x-ray was compared to

the x-ray performed on March 1, 2013, and the radiologist noted that no significant interval changes were seen in the minor degenerative changes that had been noted in the mid-cervical spine on the previous x-rays.

Dr. Baker provided a typed note, which reflects that Plaintiff reported a history of being assaulted three weeks earlier. (ECF No. 175-1, at 276.) Dr. Baker noted that the plaintiff reported being assaulted three weeks earlier and complained of neck and low back pain. He was reported taking Tylenol # 3 with no significant relief. He reported no change in bowel or bladder habits and denied numbness or tingling in the upper extremities. On examination, however, the plaintiff had decreased cervical range of motion, paracervical tenderness, point tenderness to palpation of the spinous processes at L4-5, as well as the transverse process, and he was positive for pain on straight-leg raise on the left at about 45 degrees. In addition, he walked with an antalgic gait and had difficulty bearing weight on either leg individually. (*Id.*) Dr. Baker's impression was cervical sprain, lower back contusion, and rule out fracture. Under "plan," he stated that the plaintiff was "not cleared to return to facility," and he recommended physical therapy for neck and lower back, and a CT scan to rule out lower back fracture.

This note is stamped April 16, 2013 and signed by Dr. David Moore. (*Id.*) It appears that Dr. Bernard did not see it while the plaintiff was still at DSNF. Dr. Bernard indicates, however, that he did review, on March 8, a handwritten note from Dr. Baker that contained a similar assessment of cervical sprain and low back pain and a recommendation that the plaintiff was "Not cleared. Please begin Physical therapy for C-spine and back. Obtain CT scan of lower lumbar spine." (ECF No. 175, Bernard Aff. ¶ 7.)

According to Dr. Bernard, an outside specialist cannot issue orders regarding an inmate's treatment, and it would be up to prison doctors to decide whether to adopt Dr. Baker's recommendations. On March 8, 2013, Dr. Bernard ordered that the plaintiff was medically cleared to return to his transferring facility, WTSP, and that upon return, he should be seen at sick call for follow up and review of the orthopedist's note. (*Id.* ¶ 8.) Dr. Bernard also states that, if he had seen the dictated note, it would not have changed his assessment that the plaintiff could be cleared for travel back to WTWP. (*Id.* ¶ 9.)

The plaintiff was not transported immediately back to WTSP, however, because he still had an appointment to see an ENT specialist, which did not take place until March 19, 2013. Dr. Bernard

reviewed the ENT's note regarding recommended treatment on March 20, 2013 and ordered that the plaintiff was cleared to return to WTSP.

On March 21, 2013, Dr. Bernard gave a "voice order" for the plaintiff to receive Motrin 600 mg three times a day for ten days.

The plaintiff was transferred back to WTSP on March 27, 2013. Dr. Bernard did not participate in the plaintiff's medical care after that date.

Regarding the plaintiff's allegations that Dr. Bernard should not have cleared him for transfer back to WTSP in March 2013 and that he should have received physical therapy and additional testing in accordance with Dr. Baker's recommendations, Dr. Bernard explained:

> In March 2013, the Transit Unit was not a facility in which an inmate with Plaintiff's conditions would be housed on a permanent or long-term basis. Inmates were transferred to the Transit Unit from their permanent places of incarceration for specialized services. During the period of time relevant to Plaintiff's complaints against me, which included March 6, 2013 through March 27, 2013, Plaintiff was transferred to the Transit Unit to . . . see an orthopedic specialist and . . . an ENT specialist. These two consultations had been requested by Dr. Moore on February 19, 2013. The medical records do not reflect that Dr. Moore had requested any other consultations at that time. After Plaintiff was seen by the orthopedic and ENT specialists, it was appropriate for him to be transferred back to WTSP. . . . While Dr. Baker recommended that Plaintiff not be returned to WTSP but should be kept at the Transit Unit and provided physical therapy . . . and a CT scan . . . , Dr. Baker did not have the authority to order these actions. It would not have been appropriate for me to act on Dr. Baker's recommendation. The appropriate procedure was for Plaintiff's principal treating physician, Dr. Moore, to make decisions regarding the need for, and timing of, any diagnostic testing, treatment, or consultations with specialists. Once a treating physician requests such specialized services, the services are then subject to utilization management review before final approval and scheduling. This is the procedure that was followed in Plaintiff's case. Plaintiff had numerous conditions, not just orthopedic conditions, and Dr. Moore was coordinating and managing Plaintiff's care for all of these conditions. As noted above, Dr. Moore began this process by requesting orthopedic and ENT consultation. After these were completed, he requested other specialized services. On March 28, 2013, after Plaintiff was returned to WTSP, Dr. Moore requested approval for Plaintiff to be seen by an ophthalmologist and to have an audiogram and then to be seen again by an ENT specialist. Dr. Moore also requested that Plaintiff receive physical therapy for his spine and back.

(*Id.* ¶ 16.)

The record further reflects that the plaintiff saw an orthopedic specialist again on May 30, 2013, who requested that an MRI be performed on the plaintiff's lumbar and cervical spine. Dr. Moore's initial request for the MRI, dated June 5, 2013, was denied by the utilization management reviewer on the basis that it was not supported with sufficient clinical information. Dr. Moore resubmitted the request on June 17, 2013, along with additional supporting clinical information, and the request was approved. The plaintiff

was scheduled for an MRI on July 31, 2013. For some reason, this MRI did not take place. Another request was submitted in October 2013, and the plaintiff finally underwent an MRI in February 2014. This MRI showed no significant abnormalities.

Regarding the plaintiff's transfer between prisons, Dr. Bernard averred that the actual scheduling of transfers is handled by prison security staff. Regarding the mode of transportation, Dr. Bernard states:

> I was not made aware of any condition of Plaintiff that required him to be transferred in any specialized manner. Before clearing Plaintiff for transfer, I reviewed the orthopedic and ENT notes and the cervical and lumbar x-ray reports dated March 7, 2013. This information did not provide any medical basis for transferring Plaintiff in a special manner. When Plaintiff was transferred on March 27, 2013, it had been six weeks since the date of his initial injury (February 12, 2013). His lumbar fracture should have been well on the way to healing at this time. Dr. Baker's notes do not reflect that the Plaintiff reported pain on palpation at the L-3 level, where x-rays show he had a fracture. Moreover, the lumbar x-ray reports did not note any type of misalignment or other abnormality. The x-ray reports indicated simple fractures in the lumbar spine. . . . While the March 7, 2013 lumbar x-ray report notes lumbar fractures, it appears from Dr. Baker's notes that he could not visualize the fractures when he reviewed the x-rays and this is why he wanted a CT. This does not indicate that Dr. Baker was concerned about an unidentified condition that may have put Plaintiff at risk for further injury. Rather, it suggests Dr. Baker simply desired more definitive studies. . . . Dr. Baker's recommendation for Plaintiff to receive physical therapy for his lower back and neck strongly indicates that Dr. Baker did not believe Plaintiff was at risk for additional injury. Physical therapy is not appropriate for a patient with a spinal condition that is unstable and may cause additional injuries, such as nerve damage. . . .
>
> While I do not remember the details of Plaintiff's stay at the Transit Unit in March 2013, I do not believe anyone asked me to approve Plaintiff to be transferred in any special manner. If this had occurred, it would have been my normal practice to note this in the records. If some other provider had ordered that Plaintiff be transferred in a specialized manner, it should have been reflected in the orders. The medical records do not contain any such order.

(*Id.* ¶¶ 19–20.)

In addressing the plaintiff's allegations regarding Dr. Bernard's failure to prescribe him pain medication until after the plaintiff filed a grievance, and then only authorizing ibuprofen, Dr. Bernard attested as follows:

> I understand that Plaintiff complains that I allowed his prescription for Tylenol #3 to expire and that I refused to renew it. He contends that I prescribed Motrin instead, which he alleges was insufficient for his level of pain. I could not feasibly review the medication records for all patients who passed through the Transit Unit. The normal procedure is that I would be notified by a member of the nursing staff if a patient's prescribed medication had expired. While Plaintiff claims that he filed a grievance regarding his not receiving his medication, I was not informed of any such grievance and I have not seen one. The records reflect that Plaintiff's prescription for Tylenol #3 expired on March 11, 2013, and I provided a voice order for Motrin on March 21, 2013. However, the medication administration records reflect Plaintiff began receiving Motrin on March 19, 2013. . . . [T]he prescription of Motrin would have been my normal practice for a

patient with Plaintiff's presentation. Since patients typically are at the Transit Unit for only a short period of time, unless there is an acute need for a narcotic, it is not my practice to order a narcotic for pain associate[d] with a chronic condition. It was my opinion that Motrin was appropriate for Plaintiff's condition as it was described in the reports I read and the x-rays I reviewed. . . . I would have left the decision for the renewal of a narcotic to Dr. Moore, to whose care Plaintiff would soon be returning. I did not need to personally examine Plaintiff to make a decision concerning his pain medication. I relied on the records I reviewed and very likely the report of the nurse who contacted me. This is normal practice, and it meets or exceeds the standard of care.

(*Id.* ¶ 21.)

## B.     Analysis

As grounds for their motion for summary judgment, the Corizon Defendants argue that: (1) Dr. Bernard's conduct was medically appropriate and does not satisfy the requirements for a claim of deliberate indifference to a serious medical need in violation of the Eighth Amendment; (2) because Dr. Bernard's care was medically appropriate and did not violate the United States Constitution, there is no basis for imputing corporate liability to Corizon; (3) because Dr. Bernard's decisions were based on his independent medical judgment, there is no evidence to support a claim that any custom, policy or procedure of Corizon caused harm to the plaintiff; (4) Dr. Bernard's decision to clear the plaintiff for travel in March 2013, on the regular chain bus instead of a van with padded seats, was based on the available medical information and supported by the record, and did not amount to deliberate indifference; (5) Dr. Bernard's refusal to implement Dr. Baker's recommendations was consistent with the efficient operation of the Transit Unit and compatible with established protocol requiring that a medical treatment plan be initiated and implemented by the principal treating physician; (6) the plaintiff did not suffer any injury as a result of being transferred back to WTSP in the regular bus; (7) no one asked Dr. Bernard to order the plaintiff to be transferred in a special manner; and (8) the prescription of ibuprofen was medically appropriate and there is no evidence that Dr. Bernard purposefully ignored any request for pain medication.

The magistrate judge agreed with the defendants' arguments and recommends granting summary judgment. As set forth above, the plaintiff objects to the R&R on the basis that there are disputed issues of fact as to whether the plaintiff had a sufficiently serious medical condition of which Dr. Bernard was subjectively aware, and that Dr. Bernard acted with deliberate indifference to the plaintiff's serious medical needs when he failed to prescribe pain medication in a timely fashion, sent the plaintiff back to WTSP instead of keeping him at DSNF to undergo physical therapy, and cleared him to return to

WTSP on a regular prison bus with unpadded seats instead of a van with padded seats. The plaintiff also insists that Dr. Bernard was in a policymaking role as an employee of Corizon, which alone is sufficient to support the plaintiff's claims against Corizon.

As an initial matter, the court will overrule the plaintiff's objections to the recommendation that defendant Corizon be granted summary judgment. There is simply no evidence in the record to support the plaintiff's claim that Dr. Bernard was in a policymaking role such that his decisions can be imputed *per se* to Corizon. Dr. Bernard attested that all his decisions regarding the plaintiff's care were based upon his independent medical judgment, and the plaintiff simply has no ability to refute that evidence. Corizon is entitled to summary judgment.

As for the claims against Dr. Bernard, there is also no evidence in the record that the doctor was personally aware of the fact that the plaintiff's Tylenol #3 prescription had expired and that the plaintiff was without any pain medications at all from approximately March 11 until March 19, 2013. Dr. Bernard denies that he had any knowledge of the status of the plaintiff's pain medications until a nurse brought the issue to his attention. The plaintiff, for his part, has not explained what steps he took after March 11 to obtain either a refill or a different pain medication other than to indicate that he filed a grievance. He does not state when he filed the grievance or provide a copy of it, and Dr. Bernard testified via affidavit that he never received a copy of any such grievance. The facts simply do not support the plaintiff's claim that Dr. Bernard was responsible for the gap between prescriptions or, consequently, that he was deliberately indifferent to the plaintiff's serious medical need for effective pain medication between March 11 and March 19.

Likewise, insofar as the plaintiff contests Dr. Bernard's decision to prescribe ibuprofen instead of Tylenol #3, Dr. Bernard has explained the medical rationale for his decision. Although the plaintiff claims that ibuprofen was not effective, he also told Dr. Baker, as reflected in Dr. Baker's notes, that Tylenol #3 was not effective. More to the point, the plaintiff cannot refute Dr. Bernard's explanation that the plaintiff's principal treating physician, Dr. Moore, to whose care the plaintiff was returning within a few days, was the healthcare professional most knowledgeable about all of the plaintiff's conditions and therefore responsible for prescribing stronger pain medications. The plaintiff cannot establish that Dr. Bernard acted with deliberate indifference based on his refusal to prescribe Tylenol #3 instead of Motrin 600 mg.

The plaintiff's claim against Dr. Bernard based on his clearing the plaintiff to return to WTSP instead of staying at DSNF to receive physical therapy, contrary to Dr. Baker's recommendations, also fails. The plaintiff relies on a number of TDOC Policies, cited in his affidavit:

> Inmates identified as having any medical or dental conditions that require evaluation and/or treatment beyond that which is available at his/her institution, shall be released and/or transferred to another institution where such care is available.

(ECF No. 196, Pl.'s Aff., citing TDOC Policy #113.04(V).)

> Once the specialty consultation has been completed and unless the inmate needs additional care or procedures immediately, the inmate shall be returned to the sending institution. The institutional physician shall review the specialist's report with emphasis on the findings, treatment, and recommendations.

(*Id.*, citing TDOC Policy #113.12(VI)(F).)

The plaintiff insists, based on these provisions, that Dr. Bernard was required to order him to stay at DSNF where he could undergo physical therapy, which was not available at WTSP. The plaintiff suggests that Dr. Bernard's decision to release him to return to WTSP forever precluded his ability to undergo physical therapy as recommended by Dr. Baker.

Contrary to the plaintiff's assumptions, it is clear from the referenced regulations and from Dr. Bernard's affidavit that Dr. Moore was the principal "institutional" physician charged with formulating the plaintiff's treatment plan. Dr. Baker's recommendations did not suggest that the plaintiff needed "additional care or procedures immediately," and Dr. Bernard followed protocol by returning the plaintiff to his sending institution, and Dr. Moore's care, after he had seen the orthopedic and ENT specialists in March 2013 while he was at DSNF. Moreover, upon the plaintiff's return to WTSP, Dr. Moore prescribed physical therapy. It was apparently not approved, but that failure cannot reasonably be attributed to Dr. Bernard.

Dr. Bernard's decision to return the plaintiff to WTSP without authorizing his transport in a van with padded seats is more problematic.[2] The State has an obligation under the Eighth Amendment, to provide adequate medical care to those whom it has incarcerated. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and

---

[2] Equally problematic would be Dr. Moore's decision to send the plaintiff to DSNF on a bus with unpadded seats, but the plaintiff did not choose to sue Dr. Moore. Regardless, an unknown security officer allowed the plaintiff to travel to DSNF with a blanket he used for padding.

wanton infliction of pain' proscribed by the Eighth Amendment." *Id.* This indifference may manifested by prison doctors in their response to a prisoner's needs. *Id.* at 104. Not every instance of allegedly inadequate medical treatment, however, constitutes a violation of the Eighth Amendment. *Id.* at 105. For instance, courts have held that the accidental, inadvertent, or negligent failure to provide adequate medical care does not state such a claim. *Id.* at 105–06 (citations omitted).

Eighth Amendment deliberate-indifference claims must incorporate both an objective component—"that [plaintiff's] medical needs were sufficiently serious"—and a subjective component— "that the defendant state officials were deliberately indifferent to the plaintiff's needs." *Hunt v. Reynolds*, 974 F.2d 734, 735 (6th Cir. 1992) (citations omitted).

In order to satisfy the objective requirement, an inmate must demonstrate evidence of a sufficiently serious medical condition, that is, evidence of a medical complaint or condition of confinement that, unmitigated, "is sure or very likely to cause serious illness and needless suffering." *Helling v. McKinney*, 509 U.S. 25, 33 (1993). Under the Eighth Amendment, an inmate plaintiff must allege, at the very least, unnecessary pain or suffering resulting from prison officials' deliberate indifference to his medical condition. *Id.* (holding that a prisoner alleging that he suffered pain and mental anguish from delay in medical care states a valid Eighth Amendment claim).

As for the subjective element, "a determination of deliberate indifference does not require proof of intent to harm." *Weeks v. Chaboudy*, 984 F.2d 185, 187 (6th Cir. 1993). The plaintiff must, however, present evidence of deliberate indifference to an inmate's serious medical needs. *Molton v. City of Cleveland*, 839 F.2d 240, 243 (6th Cir. 1988) (citing *Westlake v. Lucas*, 537 F. 2d 857, 860 n. 3 (6th Cir. 1976)). In fact, "[k]nowledge of the asserted serious needs or of circumstances clearly indicating the existence of such needs, is essential to a finding of deliberate indifference." *Horn v. Madison Cnty. Fiscal Court*, 22 F.3d 653, 660 (6th Cir. 1994) (citations omitted). Thus, the pertinent inquiry is "[w]as this individual prison official aware of the risk to the inmate's health and deliberately indifferent to it?" *Thaddeus-X v. Blatter*, 175 F.3d 378, 402 (6th Cir. 1999) (citing *Farmer v. Brennan*, 511 U.S. 825, 837, (1994)).

In this case, Dr. Bernard was subjectively aware that the plaintiff had spine fractures and a neck sprain, that he was still on pain medication, that he had been prescribed narcotic pain medication when

he was still at WTSP. Dr. Bernard had read Dr. Baker's note indicating that the plaintiff had tenderness to palpation in his lumbar and cervical spine, walked with an antalgic gait, and was still using two canes to ambulate. Dr. Bernard personally authorized the plaintiff's transport back to WTSP without any inquiry into whether it would be appropriate to permit him to travel with a blanket for padding or to be transported in a van with padded seats. Dr. Bernard asserts that he was not apprised of "any condition of Plaintiff that required him to be transferred in any specialized manner," and that no one asked him "to approve Plaintiff to be transferred in any special manner." (ECF No. 175, Bernard Aff. ¶¶ 19–20.) He also asserts that the plaintiff's medical notes as of that time did not provide a medical basis for transport in any particular manner.

The court finds that these statements are subject to reasonable dispute. A layperson looking at the plaintiff's medical records might well conclude that it was inappropriate to authorize his transport in a bus with unpadded seats over a distance of more than 100 miles. Although it is undisputed that the plaintiff did not suffer any long-term exacerbation of his injuries, the wanton infliction of additional pain, standing alone, may give rise to an Eighth Amendment violation. And Dr. Bernard's assertions that "no one" asked him to approve transport in any particular manner begs the question of who, exactly, would have authorized such transport. Dr. Baker, the orthopedist, clearly did not have the authority to do so, but he did recommend that the plaintiff not be cleared for travel back to WTSP. Dr. Moore could have ordered transport in a particular fashion and likely should have, but his failure to do so did not obviate Dr. Bernard's apparent responsibility to make an independent assessment about the timing and mode of the plaintiff's transport back to WTSP. And Dr. Bernard admits that he was the person who authorized the plaintiff to travel back to WTSP.

The court finds that disputed issues of fact preclude summary judgment as to the plaintiff's claim that Dr. Bernard was deliberately indifferent to the plaintiff's serious medical needs when he authorized the plaintiff's travel back to DSNF in March 2013 in a chain bus with unpadded seats.

## C.    Conclusion

The magistrate judge's R&R will be accepted in part and rejected in part, and the Corizon Defendants' motion for summary judgment will, likewise, be accepted in part and rejected in part. Specifically, all claims against Corizon and Dr. Bernard will be dismissed *except* for the plaintiff's claim

premised upon Dr. Bernard's authorizing him to travel back to WTSP in March 2013 in a chain bus with unpadded seats.

      An appropriate order is filed herewith.

                                                ALETA A. TRAUGER
                                                United States District Judge